**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kenneth Alan Conner, et al., | No. CV-19-01076-PHX-DWL |
| Appellants, | **AMENDED ORDER** |
| v. | |
| Wilmington Trust NA, | |
| Appellee. | |

Appellants Kenneth and Deanna Conner ("the Conners") have appealed the bankruptcy court's order granting Appellee Wilmington Trust NA's ("Wilmington") motion to enforce a settlement agreement and dismissing the Conners' adversary proceeding. For the following reasons, the order of the bankruptcy court is affirmed.[1]

## BACKGROUND

I. <u>Factual Background</u>

This case stems from the 2014 foreclosure of the Conners' Scottsdale residence. (Doc. 19 at 5.) The Conners, after living in the residence for several years, refinanced their mortgage in October 2005. (Doc. 19 at 3; Doc. 19-1 at 161.) To that end, the Conners executed a deed of trust that named First Magnus Financial ("First Magnus") as the lender, Mortgage Electronic Registration System ("MERS") as the beneficiary, and Title Security

---

[1] The Conners have requested oral argument. That request is denied because the "facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument." Fed. R. Bankr. P. 8019(b)(3). *See also* Fed. R. App. P. 34(A)(2)(c) (same).

Agency of Arizona as the trustee. (Doc. 19-1 at 181-82.) After the Conners struggled to make their payments on the refinanced loan, it was modified twice by Aurora Loan Services, LLC. (Doc. 19 at 4.)

In 2012, MERS purportedly assigned the deed of trust to Nationstar Mortgage LLC ("Nationstar"). (Doc. 19 at 4; Doc. 19-1 at 220.) After this assignment, the Conners submitted several applications to further modify their loan. (Doc. 19 at 4-5.) Nationstar modified the Conners' loan once but otherwise denied these applications. (Doc. 19 at 4-5; Doc. 19-1 at 222.) As the Conners continued to negotiate for further loan modifications, they were purportedly told to discontinue payments so as to not "confuse the system." (Doc. 19-1 at 162-64.)

Nevertheless, Nationstar filed a notice of trustee's sale in December 2013. (*Id.* at 163.) The sale was scheduled for March 24, 2014. (*Id.*) Nationstar denied another loan modification request in February 2014. (Doc. 19 at 9.) At that point, the Conners contracted with a third-party counseling agency, which would handle further negotiations with Nationstar, and Nationstar "verbally informed" the Conners that the March 2014 trustee's sale would be postponed to June 2, 2014. (*Id.*; Doc. 19-1 at 163.)

In April 2014, the Conners received a letter from Nationstar stating they were delinquent on their loan. (Doc. 19 at 5.) When Mr. Conner called Nationstar to discuss the letter, he was informed that his latest modification application had been denied and that the June 2014 trustee's sale date would be placed on hold. (*Id.*) Nationstar also promised to send a new sale date via mail. (*Id.*)

The Conners continued to seek relief on their loan. (Doc. 19-1 at 163-64.) Their last option was a mortgage relief fund. (*Id.* at 164.) The application for that fund required a letter from Nationstar stating that the Conners had exhausted loan modification options. (*Id.*) In light of the phone conversation with Nationstar, the Conners waited for a denial letter to be sent to them. (*Id.*)

On May 30, 2014, and without the Conners' knowledge, Nationstar transferred the deed of trust to Wilmington. (Doc. 19 at 5.) On June 2, 2014, the trustee's sale went

forward, also without the Conners' knowledge. (*Id.*) As the holder of the deed of trust, Wilmington placed a credit bid and ultimately purchased the property. (*Id.*)

On June 20, 2014, the Conners received a letter stating that the trustee's sale had taken place. (*Id.* at 6.) In August 2014, Wilmington sold the property to CSK Investments, LLC ("CSK"). (*Id.*) The Conners then received a notice of eviction. (Doc. 19-1 at 166.) After receiving the notice, the Conners moved out of the residence. (*Id.*)

II. Procedural History

The Conners filed for bankruptcy in September 2014. (Doc. 19 at 6.) Later that month, they initiated an adversary proceeding against Nationstar, Wilmington, and CSK. (Doc. 19-1 at 72.) The complaint was later amended to include MERS and First Magnus. (Doc. 19-1 at 81 [first amended complaint]; Doc. 19-1 at 116 [second amended complaint].) Although the Conners' theories of liability expanded with their successive amendments, the thrust of the Conners' argument was that the parties involved in the foreclosure of their home lacked authority to pursue a foreclosure. (Doc. 19-1 at 72-79; 98-99; 137-139.) Specifically, the Conners alleged that MERS was never a beneficiary of the deed of trust, so it lacked the authority to assign the deed of trust to anyone. (Doc. 19-1 at 98-99; 137-139.) The assignment of the deed of trust from MERS to Nationstar, then, was void, as was every subsequent assignment. (*Id.*)

In March 2016, while a motion to dismiss the second amended complaint was pending, Nationstar, MERS, and the Conners entered into a settlement agreement. (Doc. 19 at 6; Doc. 20 at 3; Doc. 19-1 at 283-87 [actual agreement].) The agreement provided that the parties "wish[ed] to resolve their differences regarding the Complaint and the Dispute." (Doc. 19-1 at 283.) The "Complaint" referred to the adversary proceeding initiated by the Conners. (*Id.*) The Complaint included the "Dispute," which was:

> [A]mong other things, that various documents related to the Debt and the Property were invalid or void, including but not limited to the Deed of Trust as well as all assignments and other recorded documents executed by parties including MERS and Nationstar, and that Nationstar had engaged in a variety of fraudulent or otherwise improper conduct regarding the Debt and the Trustee's Sale.

- 3 -

(*Id.*) As part of the settlement agreement, the Conners agreed to "dismiss the Complaint with prejudice." (*Id.* at 284.) Finally, in a portion of the settlement agreement entitled "The Debtors' Release of Nationstar," the Conners agreed that:

> The Debtors and each and all of his current, former, and future partners, affiliates, predecessors, successors, assigns, attorneys, employees, representatives and agents (the "Debtors Releasing Parties") release and forever discharge Nationstar and each and all of its current, former and future parents, divisions, subsidiaries, affiliates, predecessors, successors, assigns, officers, directors, attorneys, shareholders, employees, representatives and agents (the "Nationstar Released Parties"), from any and all claims, charges, complaints, liabilities, obligations, promises, agreements, damages, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees) of any nature whatsoever, whether in law or equity, which the Debtor Releasing Parties now have or may have had against the Nationstar released Parties related to the Complaint and Dispute (the "Released Matters").

(*Id.*) Identical language was used to reflect the Conners' release of MERS, MERS's release of the Conners, and Nationstar's release of the Conners (with the appropriate substitutions made to reflect which parties were in which position). (*Id.* at 284-85.) All parties to the agreement were represented by counsel. (*Id.* at 286.) The agreement was signed by the Conners, Nationstar, and MERS. (*Id.* at 287.)

On March 10, 2016, the Conners, Nationstar, and MERS notified the bankruptcy court that they had reached a settlement. (Doc. 20-1 at 12-13.) Accordingly, in May 2016, the bankruptcy court entered an order dismissing with prejudice the Conners' "Second Amended Complaint and all claims in this action." (*Id.* at 16-17.) Although the order directed the clerk to close the case, the adversary proceeding was reinstated shortly thereafter.

In March 2017, the Conners filed a third amended complaint. (Doc. 19-1 at 158.) This version reiterated the factual allegations from the second amended complaint, and contained many of the same causes of action, but the only defendant was Wilmington. (*Id.* at 158-78.) After "efforts to amicably resolve" the third amended complaint failed, Wilmington filed a motion to enforce the settlement agreement against the Conners, or, in

the alternative, to dismiss the third amended complaint for failure to state a claim. (Doc. 20-1 at 41-56.) In that motion, Wilmington argued that, although it was not explicitly named in the settlement agreement, it was one of the "released parties." (*Id.* at 45.) Even if the settlement agreement didn't apply, Wilmington further argued, the third amended complaint failed to state legally cognizable claims under Arizona law. (*Id.* at 47-55.)

The Conners filed their response in January 2018. (Doc. 20-1 at 58.) In that response, the Conners argued that Wilmington was not a released party. (*Id.* at 61.) Additionally, the Conners asserted that they had new evidence that would give rise to new claims. (*Id.* at 59.) This evidence, discovered after the Conners retained an "expert in mortgage-backed securities research and foreclosure forensics," purported to show that "the very basis of foreclosure was faulty." (*Id.* at 59-60.) In light of the expert's report, the Conners claimed they could show that "Nationstar could not assign to Wilmington Trust an interest in property that was greater than Nationstar's—and Nationstar had no interest from MERS, or MERS from the original lender." (*Id.* at 64.) In a nutshell, the Conners argued that Wilmington never acquired an interest in the property that would allow it to foreclose. (*Id.*) Consequently, the Conners stated that they planned to file a fourth amended complaint. (*Id.* at 61.)

Although the Conners had indicated in this January 2018 filing that they would file their fourth amended complaint "shortly" (*id.* at 68), there was no activity in the case for eight months. (Doc. 20 at 4.) Eventually, the bankruptcy court issued an order informing the parties that dismissal of the case was imminent. (Doc. 20-1 at 72.) After the Conners failed to file anything in response, the bankruptcy court dismissed the action in October 2018. (*Id.* at 75.)

Only then did the Conners act, and they asked the bankruptcy court to reopen the case. (Doc. 20 at 4.) During a November 2018 hearing, counsel for the Conners informed the court that he had overlooked the due date for his motion to keep the case active. (Doc. 20-1 at 83.) After recounting the basics of practicing in bankruptcy court, the court "conclude[d] in [its] discretion that that dismissal is not warranted" and reopened the case.

(Doc. 20-1 at 82-89, 100.) The Conners pledged to have a motion for leave to amend, as well as a fourth amended complaint, in front of the court the week after the court reopened the case. (*Id.* at 89.)

The complaint was not filed the next week. Instead, it was filed January 15, 2019— the night before a hearing on Wilmington's motion to dismiss. (Doc 20 at 4.) The motion for leave to amend was filed three hours before the hearing. (*Id.*; Doc. 20-1 at 168.)

At the hearing, Wilmington largely reiterated the arguments made in its motion to enforce. (Doc. 20-1 at 146-68.) Wilmington asserted that the Conners' claims against it were barred by the settlement agreement, and even if they weren't, the third amended complaint failed to state a claim. (*Id.*) When counsel for the Conners began his argument, he urged the court to consider the motion for leave to amend and the fourth amended complaint before making a ruling. (*Id.* at 168-70.) The court declined to do so. (*Id.* at 170-71.)

On the merits, the Conners reiterated their argument that, because Wilmington was not a party to the settlement agreement, none of the releases applied to it. (*Id.* at 176-82.) The Conners also continued to argue that Wilmington had no authority to foreclose on their residence. (*Id.* at 184.) Finally, the Conners presented further argument on why the claims in the third amended complaint should survive a motion to dismiss. (*Id.* at 187-92.)

The court ruled from the bench on Wilmington's motion. (*Id.* at 204.) The court concluded that, "by the expressed language of the settlement, the claims against Wilmington Trust related to the assignment or Nationstar's improper conduct regarding the trustee sale were released." (*Id.* at 205-206.) The court based this determination on the settlement agreement's definitions of "dispute," "complaint," and "the released parties." (*Id.* at 204-205.)

In the alternative, the court determined that the third amended complaint failed to state a claim. (*Id.* at 206.) The court found the Conners' statutory claims unavailing and rejected their state-law tort claims. (*Id.* at 206-211.) Finally, because the court determined that the settlement agreement foreclosed the Conners' claims against Wilmington, it

1  determined there was "no reason to amend the complaint or to consider the motion to
2  amend the complaint or to consider the fourth amended complaint or its allegations." (*Id.*
3  at 210-11.) The court entered an order reflecting its decision on January 31, 2019. (Doc.
4  19-1 at 398.)

On February 14, 2019, the Conners filed a notice of appeal. (Doc. 1 at 1.) That notice was timely under Bankruptcy Rule 8002(a)(1). After several extension requests (Docs. 6, 12, 13, 21), the matter is now fully briefed (Docs. 19, 20, 23).

## ANALYSIS

On appeal, the Conners raise three issues. (Doc. 19 at 5.) First, they challenge the bankruptcy court's determination that the settlement agreement barred their claims against Wilmington. (*Id.*) Assuming the court was incorrect on that issue, they next argue that the bankruptcy court erred in declining to consider the motion to amend. (*Id.*) Finally, they argue that the bankruptcy court erred in dismissing their third amended complaint. (*Id.*)

Whether the second and third issues need be reached turns on the answer to the first issue. Accordingly, the Court begins its analysis with the settlement agreement.

I.  Standard of Review

In reviewing the scope of the settlement agreement, the Court is faced with an issue of contract interpretation. The parties disagree on the appropriate standard of review. The Conners argue that a de novo standard applies. (Doc. 23 at 3.) In contrast, Wilmington argues that the more deferential abuse-of-discretion standard applies. (Doc. 20 at 2-3.)

The Court need not resolve this issue. Even assuming the Conners are correct, and that de novo review is required, the bankruptcy court correctly determined that the Conners' claims against Wilmington are foreclosed by the settlement agreement.

II.  Merits

    A.  **Contract Interpretation**

The central question is whether the settlement agreement precludes claims against Wilmington related to the 2014 foreclosure on the Conners' home. Although Wilmington was not a party to the settlement agreement, it contends it was covered by the agreement's

release as to Nationstar.

When interpreting a settlement agreement, state law applies. *Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir. 1993). Under Arizona law, the Court's "purpose in interpreting a contract is to ascertain and enforce the parties' intent." *ELM Retirement Ctr., LP v. Callaway*, 246 P.3d 938, 941 (Ariz. Ct. App. 2010). "To determine the parties' intent, we look to the plain meaning of the words as viewed in context of the contract as a whole." *Id.* at 941-42. Further, "each section of an agreement must be read in relation to each other to bring harmony, if possible, between all parts of the writing." *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 855 P.2d 787, 791 (Ariz. Ct. App. 1993). A provision in a contract will not be read so as to render another provision meaningless. *Id.*

These principles guide the Court's interpretation of the releases. Although Wilmington is not explicitly mentioned in the agreement, the provision releasing Nationstar from claims also includes all of Nationstar's "former and future partners, affiliates, predecessors, successors, assigns, attorneys, employees, representatives and agents." (Doc. 19-1 at 284.) Because Nationstar assigned the deed of trust to Wilmington, and that assignment formed part of the Conners' theory of liability as to Nationstar and Wilmington (Doc. 19-1 at 164 ¶ 49), the meaning of "assign" serves as a starting point in determining whether Wilmington is included in the released parties.

The settlement agreement uses "assign" as a noun. When used as a noun, "assign" refers to an "assignee." *Assign*, Black's Law Dictionary (10th ed. 2014). Although "[u]se of the term is so widespread that it is difficult to ascribe positive meaning to it with any specificity," it generally reflects the transfer of some interest from one party to another. *Assignee*, Black's Law Dictionary (10th ed. 2014). Whether one is an assignee also relies on "the intent of the assignor and assignee." *Id.*

Under this definition, Wilmington is an "assign" of Nationstar. The settlement agreement does not provide a definition that would suggest an alternate or more narrow meaning of "assign," and the intent of the parties is clear—Nationstar fully meant to assign the deed of trust to Wilmington, thus making Nationstar an assignor and Wilmington an

assignee.[2]

This comports with other portions of the settlement agreement. The agreement required the Conners, without qualification, "to dismiss the Complaint with prejudice." (*Id.* at 284.) This suggests the parties intended the settlement agreement to encompass *all* of the claims the Conners had asserted during the adversary proceeding, including their claims against Wilmington.

Notwithstanding all of this, the Conners argue that "assign" does not include Wilmington. They contend that "'assigns' is clearly meant in the corporate context, not just because Wilmington Trust received a (void) assignment." (Doc. 19 at 18.) They further contend that, because "assigns" appears near "affiliates" and "predecessors" in the release, "assigns" is "clearly in reference to other entities that became either Nationstar and MERS, or entities that Nationstar and MERS might become." (*Id.* at 17.) This is essentially a *noscitur a sociis* argument—the definition of "assign" is determined by the company the word keeps. *See, e.g.*, *Estate of Braden ex rel. Gabaldon v. State*, 266 P.3d 349, 352 (Ariz. 2011).

This argument is unavailing because it ignores the full context of the release. The release covers not only "affiliates," "predecessors," and "assigns," but also "former and future partners," "attorneys," "employees," "representatives," and "agents." The full list covers a variety of legal relationships with Nationstar, not just "corporate" relationships. The closest, "affiliate," is "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate*, Black's Law Dictionary (10th ed. 2014). Even that definition, though, is not limited to a company that either became Nationstar or descends from Nationstar.

Further, the Conners' argument would render other portions of the agreement nonsensical. The Conners' released parties also include their affiliates and predecessors.

---

[2] This conclusion also defeats the Conners' argument that, because Wilmington is not a third-party beneficiary to the settlement agreement, it cannot seek to enforce it. (Doc. 19 at 18-19.) As the Conners acknowledge, this argument is premised on the assumption that "Wilmington Trust is . . . not among the 'Released Parties.'" (*Id.*) But as discussed in this order, Wilmington is a released party.

(Doc. 19-1 at 285.) Under their definition, only entities legally indistinguishable from the Conners could fall under these categories. Because the Conners are actual people, though, that category would be limited to them and them alone, rendering the inclusion of "affiliates" and "predecessors" meaningless. The Court will not interpret the agreement in that way. *Chandler Med. Bldg. Partners*, 855 P.2d at 791.

In their reply, the Conners advance a slightly different argument. They argue the settlement agreement does not include Wilmington because "Wilmington Trust produced no evidence that either Nationwide or MERS assigned their rights under the 2016 settlement agreement to Wilmington Trust." (Doc. 23 at 6.) According to the Conners, because Wilmington was an assignee *before* the settlement agreement was executed, it cannot possibly be an "assign" under the terms of the agreement. (*Id.* at 5.) Again, this argument is unsupported by the plain text of the word "assign"—its use in the agreement doesn't contemplate such a narrow construction. More important, this argument ignores the rest of the release, which includes "each and all of [Nationstar'] current, *former*, and future . . . assigns." (Doc. 19-1 at 284, emphasis added.) The Conners' argument would read the agreement to simultaneously include and exclude certain parties. Such a construction is impermissible.

A broad definition of "assign" disturbs the Conners. (Doc. 19 at 18.) In their view, including Wilmington as an "assign" means "Nationstar and MERS could shield anyone from claims by the Conners simply by assigning them an unspecified right," which would "apply the release even beyond this litigation." (*Id.*) True, the releases are broad. But they are not as limitless as the Conners claim. Even if the releases extended to any entity that "has done business" with Nationstar or MERS, as the Conners claim (Doc. 19 at 18), the rest of the settlement agreement limits the extent of the release. The releases are limited to claims "related to the Complaint and Dispute." (Doc. 19-1 at 284-85.) The Complaint is limited to the adversary proceeding initiated by the Conners at issue here, and the Dispute is a subset of the Complaint. (*Id.* at 283.) Thus, the releases only extend as far as the allegations in the Conners' adversary complaint. This context provides an important

limitation that defeats the Conners' concerns. *ELM Retirement*, 246 P.3d at 941-42.[3]

At bottom, the meaning of "assign" is clear in this case. That meaning includes Wilmington. This is not a matter, as the Conners contend, of the bankruptcy court being "more interested in reading intent into the agreement (and clearing its docket)."[4] (Doc. 23 at 6.) Instead, it is a straightforward interpretation of the plain meaning of the words of the contract. The bankruptcy court correctly determined that the settlement agreement released the Conners' claims against Wilmington.

### B. **Fraud In The Inducement**

In addition to debating the definition of "assign" in the settlement agreement, the Conners allege the settlement agreement was induced by fraud. (Doc. 19 at 19; Doc. 23 at 7-8.) In their view, they were deprived of the "true facts" behind the settlement agreement, which "cloud[s] the validity" of the agreement. (Doc. 19 at 15.)

Even if the Conners' assertion is accurate, it does not require reversal. Like contract interpretation, whether a contract is enforceable is governed by state law. *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989). Under Arizona law, a party alleging fraudulent inducement has two options: it may seek rescission of the contract or it may affirm the contract and sue for damages. *Hennesy Equip. Sales Co. v. Valley Nat'l Bank*, 543 P.2d 123, 124 (Ariz. Ct. App. 1975); *Jennings v. Lee*, 461 P.2d 161, 165 (Ariz. 1969); Restatement (Second) of Contracts § 164 (1981) (stating that a fraudulently induced

---

[3] Additionally, Wilmington presented evidence to the bankruptcy court that, when the parties were negotiating the settlement agreement, the Conners initially requested a "carve out" for future claims against Wilmington, this request was rejected, and the Conners then signed the settlement agreement despite its absence. (Doc. 19-1 at 280 ¶ 4.) Although the Court need not rely on this evidence, because the text of the settlement agreement provides sufficiently clear evidence of the parties' intent, it provides further support for the bankruptcy court's conclusion. *Cf. Associated Students of the Univ. of Ariz. v. Ariz. Bd. of Regents*, 584 P.2d 564, 569 (Ariz. Ct. App. 1978) ("The acts of parties under a contract, before disputes arise, are the best [extrinsic] evidence of the meaning of doubtful contract terms.").

[4] The Court questions the prudence of attributing ill intent to the bankruptcy court. Not only is it unpersuasive and in bad taste, it is belied by the record in this case. The bankruptcy court, in its discretion, allowed the Conners to reopen a case that had been dormant for close to a year. (Doc. 20-1 at 100.) In reaching that decision, the court generously chose to overlook several of the procedural missteps committed by the Conners' counsel and offered advice to make further proceedings go more smoothly. (*Id.* at 82-88.) Whatever the failings in this case, they are not the bankruptcy court's.

contract is voidable, but not void).

During the proceedings in bankruptcy court, the Conners' counsel stated that, although he might prefer to seek rescission of the settlement agreement, that was "not an option" because the Conners did not want to "have to return the settlement payment." (Doc. 19-1 at 42.) That means that, even if the Conners have a valid fraudulent inducement claim, their only remaining option is to affirm the agreement and sue for damages. The merits of such a case are not before the Court, but the bottom line is that the settlement agreement is still in effect.

* * *

The meaning of the settlement agreement is clear. The word "assign" in the agreement's release as to Nationstar includes Wilmington. Accordingly, the agreement precludes further claims against Wilmington. Given this conclusion, there is no need to review the bankruptcy court's analysis concerning the sufficiency of the claims asserted in the Conners' third amended complaint or the bankruptcy court's resolution of the Conners' request for leave to submit a fourth amended complaint.

Accordingly, **IT IS ORDERED** that:

(1) The decision of the bankruptcy court dismissing the Conners' third amended complaint without leave to amend is **affirmed**; and

(2) The Clerk of the Court shall enter judgment accordingly and terminate this action.

Dated this 28th day of February, 2020.

_____
Dominic W. Lanza
United States District Judge